# Collins, *et al. v.* Louisville & Nashville Railroad Co., *et al.*

### *Bill for Mandatory Injunction.*

(Decided January 9, 1912.   57 South. 833.)

1. *Waters and Watercourses; Construction; Inadequate Openings.* —The duty is upon railroad companies in constructing their embankments to provide adequate waterways so that water flowing from adjoining premises shall not be dammed up and thrown back in unnatural and harmful quantities.

2. *Same.*—Where a railroad company maintained an adequate waterway under its embankment for the natural and ordinary flow of waters, it is not liable for flooding adjoining lands, which on account of an unprecedented flood, would have overflowed if adequate provision for ordinary floods had been made.

3. *Nuisance; Nominal Damage.*—A bill to abate a nuisance at a railroad station was properly dismissed with costs, where it appeared that adequate arrangements had been made to abate the nuisance after the bringing of the suit, and that plaintiff's damages were merely nominal.

APPEAL from Shelby Chancery Court.

Heard before Hon. W. W. WHITESIDE.

Bills by J. M. Collins and another against the Louisville & Nashville Railroad Company, and another for mandatory injunction seeking to provide adequate waterways, and for damages. From a judgment dismissing the bill plaintiffs appeal. Affirmed.

SAM WILL JOHN, for appellant. After stating facts at some length counsel insists that the proprietor of the land over or through which a stream of water flows in a defined channel has a clear legal right to have the water flow in the stream as it is accustomed to flow without diminution or alteration.—*Crabtree v. Baker,* 75 Ala. 93; *Nininger v. Norwood,* 72 Ala. 277; *Hughes v. Anderson,* 68 Ala. 280; *Farris v. Dudley,* 78 Ala. This

[Collins, et al. v. Louisville & Nashville Railroad Co., et al.]

principal has been further illustrated and fortified by the following cases.—*Drake v. Lady Ensley Co.*, 102 Ala. 501; *S. A. & M. v. Buford*, 106 Ala. 303; *C. of G. v. Windham*, 126 Ala. 559; *Nixon v. Bolling*, 145 Ala. 280; *A. G. S. v. Prouty*, 149 Ala. 71. A railroad company has no more right to obstruct the natural flow of water by embankment or other artificial means, or by collecting it into an artificial channel, than it has in the same way to dispose of water from watercourses. —Authorities next above. Under the facts, and the authorities above cited, complainant was entitled to mandatory injunction, and the removal of the cause in the manner attempted was not an abatement of the nuisance complained of. The law courts furnish no adequate remedy.—*Ogletree v. McQuagg*, 67 Ala. 585; *C. of Ga. v. Windham*, *supra*. The unusual and unprecedented railfall was not an excuse.—*So. Ry. v. Plott*, 131 Ala. 318; *Gulf Red Cedar Co. v. Walker*, 132 Ala. 556; *So. Ry. v. Lewis*, 165 Ala. 555.

WHITSON & HARRISON, JOHN W. LAPSLEY, and PETTUS, & FULLER, for appellee. The injunction should not be granted when the alleged nuisance has been abated in good faith before the trial is had, although it existed when the suit commenced.—29 Cyc. 1250-1, and notes; 1 High on Injunctions, sec. 752; 18 N. J. E. 397; 96 N. Y. App. 130, nor will it be granted when it appears that the injunction might operate greatly to the prejudice of defendant, without any corresponding advantage to complainant.—*Wes. Ry. v. Ala. G. T. Ry.*, 96 Ala. 283; High on Injunctions, sec. 598. The proof shows that the railroad company brought to this work the best engineering skill and knowledge known at the time, and that the openings were properly constructed. This was all it was required to do.—*C. & W. Ry. v.*

*Bridges,* 86 Ala. 448. Mandatory injunctions will not be granted unless there is shown a strong and mischievous case of pressing necessity.—*C. & W. R. R. Co. v. Witherow,* 82 Ala. 97; *M. & M. R. R. Co. v. Ala. Mid. Ry. Co.,* 116 Ala. 60; *Clifton I. Co. v. Dye,* 87 Ala. 470; *Rouse v. Martin,* 75 Ala. 510. In city lots and urban property no servitude is owing for the natural flow of water.—*Hall v. Rising,* 141 Ala. 431. The right of action accrues only to the owner of the land at the time of the erection of the nuisance, and does not pass to the vendee by a subsequent sale.—*H. A. & B. R. Co. v. Matthews,* 99 Ala. 24; *Evans v. S. & W. R. R. Co.,* 90 Ala. 54; *Mayor, etc., of Huntsville v. Ewing,* 116 Ala. 582. The injury was occasioned by floods of unusual and unprecedented violence and volume, for which the railroad company was not liable.—*So Ry. v. Plott,* 131 Ala. 315; *Gulf Red Cedar Co. v. Walker,* 132 Ala. 556; A. & E. Enc. of Law, 1094; 1 South. 475; 57 Fed. 441.

The facts in this case show that the provision had been amply sufficient for thirty years, and no wrong other than the injury from these floods is attributed to respondents, and hence, the cases cited by appellant are without application.

SAYRE, J.—Collins and Bulke filed their separate bills against the Southern Railway Company and the Louisville & Nashville Railway Company jointly, were alike unsuccessful in the court below, and each prosecutes his appeal; but, because their cases were in all substantial particulars alike, the evidence was taken in one case for both, and so, by agreement, one transcript is made to serve the purpose of both appeals. The cases will be considered as one.

The lines of the Southern Railway, constructed about 60 years ago, and the Louisville & Nashville Railroad,

constructed about 40 years ago, intersect at Calera. Across the northwest angle the Louisville & Nashville Company for many years has maintained a Y track connecting the two lines, and inclosing an area of five acres. All these tracks are laid upon embankments eight to ten feet above the natural surface of the earth. Prior to the wrongs complained of a double rock culvert, each division of which measured four by four feet, passed under the Southern Company's embankment about 100 feet west of the intersection of the two lines, and through this culvert passed all the water naturally flowing in that direction from the territory in the northwest angle of the two roads, comprising a natural drainage area of approximately 200 acres, and the water from an area of 5½ acres in the northeast angle, also a part of the same natural watershed, was let through the embankment of the Louisville & Nashville Company's main line, and into the triangle by a 15-inch pipe. Water falling northwest of the Y passed through a culvert under that track, and across the triangle down to the double culvert under the Southern line. There is no complaint of the concentration of water effected by the culvert under the Y, and for many years before these bills were filed, as we infer, a ditch with raised banks was maintained by complainants and their predecessors in title, which carried this water directly to the mouths of the double culvert under the Southern track, and, so long as this last-mentioned culvert was sufficient to discharge promptly the water carried to it, there can be no doubt that the culvert under the Y and the ditch constituted a means of disposing of the surface water most advantageous to the owners of property situate within the triangle. When the houses now owned and occupied by complainants were built by their vendor, who owned the land at that time, the course of

this ditch was somewhat changed so as to lead the water coming under the Y track alongside the western edge of Collins' lot—Bulke's lot being still further to the east—instead of diagonally across as theretofore. This ditch, as thus changed, runs directly to a concrete culvert under the embankment of the Southern Railway, opened since these bills were filed as will be noticed presently, and thence alongside the embankment to an additional avenue of discharge through the mouths of iron pipes which have been substituted for the double rock culvert, under conditions to be stated in a moment. The surface of the drainage area forms the segment of a shallow basin which declines gradually to the neighborhood of the culverts under the Southern track, and complainants assert by bills and briefs that prior to the overflows complained of, and for many years, the double rock culvert was sufficient to properly carry off the water naturally seeking that point. The properties owned by complainants, one a hotel, the other a storehouse, are located in the triangle and face the Southern track just opposite the mouths of the double culvert which open about 40 feet from the property line. There is evidence to the effect that a six-inch head of water will cover the entire properties of these complainants, so nearly level are they. In the spring of 1906 the Louisville & Nashville Company, having some sort of arrangement with the Southern Company to that end, began preparation for the erection of a passenger station for their joint use and occupancy in the southeast angle of the two lines by laying two 36-inch iron pipes opposite to and in line with the mouths of the double rock culvert, but leaving a small interval between, the expectation being that the rock culverts under the Southern track would be replaced by similar pipes to be connected. Afterwards the Louisville & Nashville Com-

pany began the foundation for its station, which would'
stand over the iron pipes, and·in so doing filled a ditch
which would carry away any water discharged by the·
double rock culvert in excess of the quantity the iron
pipes would accommodate.    While things were in this·
shape, heavy rains in March and September, 1906, flood-
ed the northwest angle between the roads, doing dam--
age to complainants' properties.    Thereafter the station
was completed, earth being filled in up to the level of'
the embankments upon which .are the tracks; also the·
Southern Company replaced the double rock culvert
under its track with iron pipes similar to and connect--
ing with the pipes put down by the other company.
Still later the Southern Company carried materials to·
the spot, and was preparing in a leisurely way to con-
struct an additional culvert of concrete under its track
at the point where the ditch we have mentioned first
touches its embankment, but, before much was done,
Collins and Bulke filed these bills on September 14 and
24, 1907, respectively.    In November following the addi--
tional culvert was completed providing a waterway
equal in capacity, however estimated, to a culvert meas-
uring 4 feet in width by 3½ in height.

In the bills it is averred that the two iron pipes were
not equal to the burden of carrying off promptly the
water from the triangle in which complainants' prop-
erties are located, and relief is sought by way of man-
datory injunction requiring defendants to provide ad-
ditional waterways through their embankments.    In--
cidentally complainants seek to recover damages alleg-
ed to have been caused by overflows at various times.
since the Louisville & Nashville Company laid its iron
pipes.    It was the duty of defendants in the construc-
tion of their works to provide adequate waterways so
that the water naturally flowing from the complainants'

premises across land occupied by the defendants should not be dammed up and thrown back upon complainants' premises in unnatural and harmful quantity, and we agree with the chancellor in holding that the iron pipes alone seem to have been inadequate for the purpose, but that these pipes, in conjunction with the concrete culvert, put in since these bills were filed, are sufficient to carry away the water as fast as delivered to them, and that no relief in the matter of providing for the flow of water is now necessary. We also agree with his conclusion, as we read the decree, that no recoverable damages have been shown. Such damage as was caused by the rainfall of March, 1906, was at the time these bills were filed barred by the statute of limitations of one year duly pleaded. The damages suffered in September, 1906, was probably caused by an unprecedented flood. Question is made in briefs whether the circumstance that the flood was unprecedented ought to have an influence in a decision respecting the rights and obligations of the parties. In Joyce on Nuisances the rule is stated as follows: "Negligence of the defendant is not ordinarily an essential element in an action for damages sustained by reason of a nuisance. The action is founded on the wrongful act in creating or maintaining it, and the negligence of the defendant, unless in exceptional cases, is not material."—Section 44. The general rule here stated is in accord with the rulings of this court in a number of cases.—*Savannah, Americus & Montgomery Ry. v. Buford,* 106 Ala. 303, 17 South. 395; *Central of Georgia Ry. Co. v. Windham,* 126 Ala. 559, 28 South. 392; *Lindsey v. Southern Ry.,* 149 Ala. 349, 43 South. 139. The rule and authorities have been recently considered by the Court of Appeals of this state in an interesting case (*Alabama Western R. R. Co. v. Wilson,* 1 Ala. App. 306, 55 South. 932)

in which appellant sought to establish an exception on grounds different from that here urged. We are not advised of any case in which the precise question here mooted has been decided. There may be merit in appellee's contention, and such seems to be the intimation of *Lindsey v. Southern Ry., supra,* and *Southern Ry. v. Lewis,* 165 Ala. 555, 51 South. 746, 138 Am. St. Rep. 77, though in the first named of these cases the court's expression is dictum, and in the second the existence of the exception was denied for the reason that, although the damage complained of was caused by unprecedented rains, the defendant had been guilty of a wrong as things appeared at the time of the construction of its track by so constructing it as to cause water to flow over plaintiff's land which in the course of nature would have flowed elsewhere. The same initial wrong was committed by the defendants in *Central of Georgia v. Windham, supra, Alabama Great Southern v. Prouty,* 149 Ala. 71, 43 South. 352, and *Central of Georgia v. Champion,* 160 Ala. 517, 49 South. 415, cases to which we are referred by appellants. These cases involved no question concerning unprecedented rainfalls. In the first named (*Windham's Case*) defendant sought to be excused on the ground that the rainfall was unusual merely. Its excuse was denied. In the case at hand there was no means of determining at the time that the act of the Southern Company in providing the double rock culvert was wrongful, for there was no artificial enlargement of the drainage area discharging its water over the land upon which that defendant constructed its embankment, nor did the climatic history of the country give any premonition of the exigency created by the rains of September, 1906. Having made in the beginning, and subsequently maintained, adequate provision for every exigency to be anticipated, in such case,

.at least, it seems that the Southern Company should be 'acquitted of responsibility for the results of an un-precedented flood. We need not, however, state any definite conclusion as to this for the reason that the chancellor's decrees in respect to damages suffered in September may be sustained with entire propriety, we think, upon the ground on which he put them, to wit, .as long as defendants were required to provide for the flow of water under their tracks, they could not have provided against the consequences of that extraordinary flood, because the uncontradicted testimony is that on that occasion the creek, flowing a short distance south of the point in question and draining a large area of country, and into which all the water from the circum-scribed area in question naturally flowed, was so swol-len that its water reached the level shown to have been reached by the water inside the triangle. Against such .a contingency the defendants were not required to pro-vide, for no rule of reason would require them to so pro-vide for complainants' benefit as to restrain the creek within its banks in the event of an unprecedented flood.

There was testimony tending to show that on two other occasions water found its way into the cellar under Collins' store and covered the soil under Bulk's hotel. But we are confident that these results follow-ed from the nature of the place in which these buildings stood in connection with some negligence in keeping the ditch leading from the Y track, rather than from .any incapacity of the double culvert or iron pipes to carry off the rainfall.

As for the drainage of water from the premises of complainants, we are of opinion that at the time of the submission of the cause for decree the defendants had made adequate provision for it, and that, in conse-quence, the bill was properly dismissed, defendants be-

ing taxed with the cost for the reason that they did not apply the remedy before these bills were filed.

These bills further show that privies or closets had been constructed inside the station, and that their droppings were deposited in the iron pipes, whence they were washed away only when rains furnished water enough for that purpose. From these pipes a stench arose in times of dry weather, causing annoyance to complainants. One purpose of the bills was to have this arrangement declared a nuisance and abated. There is really some difficulty in determining just how much of the stench complained of, and which was undoubtedly present at times, arose from the closets and pipes maintained by defendants, and how much was contributed by a privy set over the ditch by complainants, or even by other causes indicated in parts of the evidence. Conceding, as the better course, that the defendants' closets and pipes, as originally constructed, were a nuisance, it appears that pending a final decree in these causes defendants have arranged for the flushing of these closets as often as used by connecting them with a standpipe near at hand. Bulke, in his testimony, concedes that the odor is not as bad as formerly, while Collins, who has been at his place of business in his storehouse steadily since these bills were filed, testifies that he has not smelled any odor since that time. The testimony of other witnesses makes it reasonably clear that, so long as these closets are properly cared for there will be no occasion for complainant on that account. If they should hereafter be so used as to become a nuisance, complainants will have their remedy at law or in equity; and this, in part at least, is what we understand the chancellor to have intended when he said in his opinion in Collins' Case: "Under all the facts of this case as they now stand, complainant should be left

to his action at law to recover any such damages as may result to him by reason of the actions of the respondents."

The only remaining question is whether the cause ought to be retained for the assessment of damages alleged to have accrued to complainants by reason of odors during the interval between the erection of the station with its closets and the introduction of the flushing apparatus. It cannot be said on the record presented that complainants suffered in health, in business, or in the permanent or rental value of their property. They endured the occasional annoyance of a bad smell. Theoretically a right of action exists for every wrong and injury, however slight. But some injuries are so silght as to be compensated by damages merely nominal, and we are of opinion that the injury here shown must be assigned to that class. Complainants' right to the intervention of equity in the case presented has been vindicated by the decrees rendered. The chancellor we therefore hold correctly dismissed the bills, after charging defendants with the costs, refusing to retain them for any purpose, and his decrees ought to be affirmed.

Affirmed. All the Justices concur, except, DOWDELL, C. J., not sitting.